IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ANTONIO RODRIGUEZ-RAMIREZ                                        PLAINTIFF

           v.                      Civil No. 06-5062

SHERIFF TIM HELDER;
and DR. HOWARD                                                  DEFENDANTS


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds pro se and in forma pauperis.

Plaintiff is currently incarcerated in the Arkansas Department of Correction.  The events at issue in this lawsuit occurred while the plaintiff was incarcerated at the Washington County Detention Center.  Specifically, plaintiff asserts two separate claims:  (1) he contends he was denied adequate medical care; and (2) he contends he was discriminated against because of his race and/or because he does not speak and write English.

Defendants filed a summary judgment motion (Doc. 15).  To assist plaintiff in responding to the motion, a questionnaire was propounded (Doc. 18).

Plaintiff filed a timely response to the questionnaire (Doc. 22).  The summary judgment motion is before the undersigned for issuance of this report and recommendation.

-1-

## **Background**

Rodriguez-Ramirez[1] was booked into the Washington County Detention Center (WCDC) on November 5, 2005, on pending criminal charges. *Plaintiff's Response* (Doc. 22)(*hereinafter Resp.*) at ¶ 1; *Defendants' Exhibit* (*hereinafter Defts' Ex.*) 1 at page 1. As part of the booking process, a medical intake questionnaire was completed. *Resp.* at ¶ 2; *Defts' Ex.* 2 at page 1. The questionnaire indicated Rodriguez-Ramirez had no health problems other than that he could not eat onions. *Id.*

Rodriguez-Ramirez indicated he felt like the questions were not very thorough. *Resp.* at ¶ 2. He also felt like he was rushed through the questions by the booking officers without them trying to properly trying to assess his problems. *Id.* Finally, he indicates it was prepared by a person who was working through an unlicensed translator. *Id.*

The booking papers include a Washington County Sheriff's Department medical release and consent for medical services form agreeing to request medical treatment in writing and holding the jail harmless from any pre-existing injuries or illnesses. *Defts' Ex.* 2 at page 2. The papers also include an inmate medical insurance information form on which Rodriguez-Ramirez agrees to be responsible for his medical bills. *Id.* at page 3. Both contain Rodriguez-Ramirez's signature. *Id.* at pages 2 & 3.

Rodriguez-Ramirez asserts he signed both documents under duress. *Resp.* at ¶ 3 & ¶ 4. He indicates he does not speak English and felt pressured to sign the papers. *Id.* at ¶ 4.

---

[1]In many of the documents contained in the summary judgment record, plaintiff simply signed his name Antonio Rodriguez. Plaintiff also used Antonio Rodriguez in filing this lawsuit. However, the plaintiff's full name, as noted on the Arkansas Department of Correction website, is Antonio Rodriguez-Ramirez-Ramirez. The clerk was directed to change the docket to reflect the plaintiff's name is Antonio Rodriguez-Ramirez (Doc. 19).

-2-

Moreover, he states he was told if he did not sign the papers he would stay in the holding cell and have no access to a mattress, blanket or hygiene supplies.  *Id.* at ¶ 3.

On November 6th, Rodriguez-Ramirez was released from the WCDC on bond.  *Resp.* at ¶ 5.  On December 6th, a post-arrest warrant was issued by the Washington County Circuit Court for Rodriguez-Ramirez's arrest for breaking or entering, a class D felony.  *Defts' Ex.* 1 at page 5.  Rodriguez-Ramirez states that since he is unable to speak or comprehend English he has felt overwhelmed since the beginning of this ordeal.  *Resp.* at ¶ 6.  Because he has not been provided with an unbiased translator, he indicates he has been unable to confirm or deny this particular warrant.  *Id.*

On December 6th, a felony information was filed against Rodriguez-Ramirez in the Washington County Circuit Court for breaking and entering a vehicle and taking a watch, stereo remote, two small speakers, a gold chain, a ring, and a cell phone.  *Defts' Ex.* 1 at page 6. Rodriguez-Ramirez contends these charges were dropped.  *Resp.* at ¶ 7.

He was booked back into the WCDC on December 7th on charges of no proof of insurance, no drivers license, and traffic violations.  *Id.* at ¶ 8.  A medical questionnaire was completed indicating he had no health problems.  *Defts' Ex.* 2 at page 6.  Rodriguez-Ramirez again signed medical release and consent for medical services forms and a medical insurance information form agreeing to be responsible for his medical expenses.  *Defts' Ex.* 2 at pages 4-5. Rodriguez-Ramirez maintains he signed these papers he did not understand under duress in order to be provided basic hygiene items and a blanket.  *Resp.* at ¶ 9 - ¶ 11.  Rodriguez-Ramirez was released on December 8th.  *Resp.* at ¶ 12.

AO72A
(Rev. 8/82)

He was booked back into the WCDC on December 18th on charges of possession with intent to manufacture, simultaneous possession of drugs and a firearm, being a felon in possession of a firearm, and possession of drug paraphernalia. *Resp.* at ¶ 14.  He bonded out on December 19th. *Id.* at ¶ 17.

As part of the booking process, a medical questionnaire, a medical release and informed consent for medical services form, and a medical insurance information form were all completed. *Defts' Ex.* 2 at pages 7-9.  Rodriguez-Ramirez indicates he signed these papers under duress. *Resp.* at ¶ 15 & ¶ 16.  He indicates he did not understand the papers, did not speak English, and had no translator. *Id.*

Rodriguez-Ramirez was to appear in court on January 6, 2006. *Defts' Ex.* 1 at page 9. On January 17th, he was arrest for failure to appear and booked back into the WCDC. *Id.* at page 13.

As part of his intake, a medical questionnaire was completed that indicated he had no health problems other than being allergic to onions. *Defts' Ex.* 2 at page 10.  Rodriguez-Ramirez contends he did not understand the paper and was under duress when he signed it. *Resp.* at ¶ 19.

On January 26th, Rodriguez-Ramirez asked for and was provided with the address of the Springdale Jail. *Defts' Ex.* 3 at page 1.  Rodriguez-Ramirez indicates he attempted to obtain information from deputies repeatedly and was finally given the address. *Resp.* at ¶ 21.

On February 2nd, a medical request was submitted that appears to have been signed by Rodriguez-Ramirez. *Defts' Ex.* 3 at page 2.  On the request, Rodriguez-Ramirez asks be moved

-4-

to D pod because it was very noisy and he could not sleep at night.  *Id.*  In response, the inmate was told that people were only moved for the safety and security of the facility.  *Id.*

The request is written in English.  Rodriguez-Ramirez indicates he "never filled out any request for myself in english."  *Resp.* at ¶ 22.  He then states "[t]his issue was never addressed." *Id.*  It is not clear from this whether Rodriguez-Ramirez contends this request was not submitted on his behalf.  *Id.*

On February 2nd, Rodriguez-Ramirez submitted a grievance in Spanish.  *Resp.* at ¶ 24; *Defts' Ex.* 3 at page 3.  It was responded to in Spanish.  *Id.*

On February 5th, Rodriguez-Ramirez submitted a request stating his Father, who was 70 years old, was gong to have surgery down in Mexico.  *Defts' Ex.* 3 at page 4.  He asked that the jail contact immigration and ask them to send him to Mexico as soon as possible.  *Id.*

In response, Rodriguez-Ramirez was told that he would have to contact his family and have them contact the Immigration and Naturalization Service (INS).  *Defts' Ex.* 3 at page 4.  He was told he could talk to the Chaplin but that he could not tell the INS to hurry and pick Rodriguez-Ramirez up.  *Id.*

Rodriguez-Ramirez states he was unable to communicate his request properly because of his limited understanding of the English language.  *Resp.* at ¶ 23.  He states he was forced to rely on "jailhouse translators."  *Id.*  Rodriguez-Ramirez contends this issue was never resolved. *Id.* at ¶ 25.

On February 8th, Rodriguez-Ramirez submitted a request stating he had submitted a request the day before for the sergeant and hadn't had a response yet.  *Defts' Ex.* 3 at page 5.  In

-5-

response, he was told that the sergeants received requests daily from over 400 detainees and it sometimes took a few days to get an answer. *Id.* He was told to be patient. *Id.*

Rodriguez-Ramirez asserts he repeatedly attempted to resolve issues through proper channels only to have deputies fail to acknowledge his requests. *Resp.* at ¶ 26. When Rodriguez-Ramirez pressed the issues, he states "they acted unprofessionally and with disregard to their duty (regardless of 400 inmates)." *Id.*

On February 13th, Rodriguez-Ramirez submitted a request asking what his court date was. *Resp.* at ¶ 27. He stated it had been set that day but no one came for him. *Id.* He was told that it was February 15th and his bond was $75,000. *Id.*

On February 14th, Rodriguez-Ramirez submitted a medical request for a rash on his face and above his eyes. *Resp.* at ¶ 28. He asked for some cream. *Id.*

Rodriguez-Ramirez was seen by Nurse Bradley the following day. *Defs' Ex.* 2 at page 13. She noted no rash or redness on his face or above his eyes. *Id.* She indicated she would monitor the situation. *Id.*

Rodriguez-Ramirez states he was simply told by the medical staff that he didn't have a problem. *Resp.* at ¶ 29. However, he was charged $3.00. *Id.*

On February 17th, Rodriguez-Ramirez submitted a request asking if he had any holds. *Resp.* at ¶ 30. He was told that he had an INS hold, a failure to appear charge, and his bond was $75,000. *Id.*

On February 22nd, a legal assistance request was made on Rodriguez-Ramirez's behalf to the public defender. *Defs' Ex.* 3 at page 8. It was noted he had an INS hold he wanted to get

resolved. *Id.* It was noted Rodriguez-Ramirez had family matters that needed his attention and that he did not speak English. *Id.*

Rodriguez-Ramirez states he submitted various requests on numerous occasions stating he did not speak English. *Resp.* at ¶ 31. He indicates these requests were often ignored. *Id.* However, he concedes the fact that one may have been sent to the public defender. *Id.*

On February 22nd, Rodriguez-Ramirez submitted a medical request. *Defts' Ex.* 2 at page 14. He stated that he had written a request about a week ago asking to see the nurse. *Id.* He stated he had not been seen. *Id.* He stated that it was about his back and head. *Id.* He said he was broken out bad all over. *Id.* He didn't know if it was caused by the blanket or what. *Id.*

In response, it was noted that Rodriguez-Ramirez had bumps on his back and head that were itchy and had been there about two weeks. *Defts' Ex.* 2 at page 14. Rodriguez-Ramirez was put on the list to see the doctor and given a cotton blanket. *Id.*

Rodriguez-Ramirez indicates he repeatedly asked officers to help him see the medical staff but was often ignored. *Resp.* at ¶ 32. He indicates he wrote, or had prepared, a written medical request. *Id.* Upon seeing the nurse, he indicates he felt it could be possible that he had "staph infection." *Id.* He was seen by Dr. Howard. *Id.* at ¶ 34.

Rodriguez-Ramirez indicates he was treated unprofessionally by the medical staff. *Resp.* at ¶ 33. He asserts the nurse berated and belittled him. *Id.*

On February 22nd, Rodriguez-Ramirez submitted a grievance asking why his request about his Father had been ignored. *Defts' Ex.* 3 at page 9. He asked how he could get a speedy trial. *Id.* He stated he needed to see his Father before he died. *Id.*

-7-

In response, Rodriguez-Ramirez was told that his requests had not been ignored. *Defts'*

*Ex.* 3 at page 9.  He was told that the Chaplain had been informed of his requests as had the

sergeant.  *Id.*  He was also told that they could not do anything about his INS hold.  *Id.*

Rodriguez-Ramirez states he submitted numerous requests related to the welfare of his

family and in an attempt to receive a properly certified translator.  *Resp.* at ¶ 35.  He did not

contact the INS nor did any member of his family.  *Id.* at ¶ 36(B).  Rodriguez-Ramirez contends

he was unable to contact his family.  *Id.*  He asserts he was being manipulated by jail employees

and his public defenders.  *Id.*  Throughout the entire process, Rodriguez-Ramirez contends he

had a tremendous amount of trouble just getting a request form from officers much less getting

anything productive accomplished.  *Id.*

On February 28th, Hernandez submitted a grievance in Spanish.  *Defts' Ex.* 3 at page 10;

*Resp.* at ¶ 37.  The grievance was responded to in Spanish by Officer Hernandez.  *Id.*

On February 28th, Rodriguez-Ramirez submitted a medical request to have the nurse

examine a tumor on his back.  *Defts' Ex.* 2 at page 15.  Rodriguez-Ramirez also stated he had

neck problems.  *Id.*

Nurse Moss examined Rodriguez-Ramirez and noted a raised bump on the right side of his back

that had been there about a week.  *Id.*

Rodriguez-Ramirez indicates he was attempting to obtain emergency medical treatment

due to severe pain and swelling.  *Resp.* at ¶ 38.  He states he was denied emergency treatment

and referred to the sick call process.  *Id.*  He maintains he could not understand much of what

the nurse said since he does not speak English.  *Id.* at ¶ 39.

-8-

AO72A
(Rev. 8/82)

On March 1st, Rodriguez-Ramirez was brought to the nurse's station complaining of an infection on his neck.  *Defts' Ex.* 2.  According to Nurse Johnson's notes, she examined Rodriguez-Ramirez and noted a cyst like node on the back of his upper shoulder.  *Id.*  It was raised about a ½ inch and was about the size of a half dollar.  *Id.*  She noted it was grayish in color and had what appeared to be small capillary vessels in it.  *Id.*  It was firm to the touch.  *Id.*  She indicates Rodriguez-Ramirez told her it came up about a week ago.  *Id.*  Nurse Johnson put Rodriguez-Ramirez on the list to see Dr. Howard.  *Id.*

Rodriguez-Ramirez maintains he requested emergency medical treatment for his worsening condition and was denied the emergency treatment.  *Resp.* at ¶ 40 & ¶ 41.  Rodriguez-Ramirez was seen by Dr. Howard.  *Id.* at ¶ 41.

On March 2nd, Rodriguez-Ramirez submitted a request to see his public defender ASAP.  *Resp.* at ¶ 42.  His request was faxed to the public defender's office.  *Id.*

On March 9th, he requested information on work release.  *Resp.* at ¶ 43.  He was told that he could not get work release on his charges.  *Id.*

On March 10th, he requested the address to immigration or access to the library.  *Defts' Ex.* 3 at page 13.  In response he was told to contact an outside source for the information and that access to a law library must be ordered by a judge.  *Id.*

Rodriguez-Ramirez contends he was refused access to immigration officials and denied access to communicate with his family.  *Resp.* at ¶ 44.  He also states he was denied access to the law library.  *Id.*

-9-

On March 12th, Rodriguez-Ramirez submitted a medical request. *Defts' Ex.* 2 at page 17. He stated that the cyst on his right shoulder was keeping him from sleeping at night. *Id.* He said he was in bad pain. *Id.* He indicated the pain was in his entire right side. *Id.* He stated he could not take it anymore. *Id.*

In response, Nurse Moss prescribed Ibuprofen, three times daily, for fourteen days, and put Rodriguez-Ramirez on the list to see Dr. Howard. *Defts' Ex.* 2 at page 17. Rodriguez-Ramirez maintains he requested emergency medical treatment for severe pain and his request was denied. *Resp.* at ¶ 45 & ¶ 46(A). He also maintains the nurse was rude to him. *Id.* at ¶ 46(A). Finally, he states he only received the Ibuprofen for three days and he was in constant pain. *Id.* at ¶ 46(B).

Rodriguez-Ramirez was seen by Dr. Howard on March 15th. *Defts' Ex.* 2 at page 20. Dr. Howard noted the cyst was not serious and needed to be removed when Rodriguez-Ramirez got out. *Id.* Dr. Howard prescribed Tylenol PM for three nights. *Id.*

Rodriguez-Ramirez asserts he was denied medical treatment and told they would not do anything for him despite the growing lump on his back. *Resp. at* ¶ 47(A). He also maintains Ibuprofen and Tylenol were "not sufficient to treat a possible undiagnosed cancerous growth." *Id.*

On March 15th, Rodriguez-Ramirez submitted a request stating that he needed to be able to work in jail. *Resp.* at ¶ 48. He stated his children had not eaten in several days and his wife could not work because she did not have a social security number. *Id.* He stated that he was in jail for drugs that were not his. *Id.*

-10-

In response, Rodriguez-Ramirez was told he was charged with failure to appear on underlying charges of breaking or entering and his bond amount was $75,000. *Defts' Ex.* 3 at page 14. He was also told he had an INS hold. *Id.* He was told he did not have any drug charges. *Id.* Because he was not committed he was told he could not work as a trustee. *Id.* In order for him to get out of jail, he was told he would have to bond out and then go with the INS. *Id.*

On March 16th, Rodriguez-Ramirez stated he wanted to be released from jail until it was time for him to be deported. *Defts' Ex.* 3 at page 15. He also asked to speak to someone who could speak Spanish about his case. *Id.*

In response, he was told that he could not be released from jail unless he bonded out. *Defts' Ex.* 3 at page 15. He was told he should probably speak to his public defender. *Id.*

On March 20th, Rodriguez-Ramirez asked that a paper be faxed to the public defender's office. *Defts' Ex.* 3 at pages 16-17. According to defendants' records, it was faxed. *Id.* Rodriguez-Ramirez, however, states he is not sure it was faxed since Corporal Matthews, a Washington County deputy, destroyed his legal documents. *Resp.* at ¶ 52.

On March 21st, Rodriguez-Ramirez submitted a medical request stating the medication the doctor gave him wasn't working. *Resp.* at ¶ 53. He stated he was hurting bad and he thought it might be a tumor. *Id.* He stated that just because he was an illegal didn't mean he didn't have rights. *Id.* If they couldn't help him with his problem, he felt he should be sent back to his country. *Id.* He believed he needed surgery. *Id.* He asked that they get immigration over there

-11-

so he could get help.  *Id.*  Rodriguez-Ramirez states he was forced to suffer extreme pain and

neglect.  *Id.*

In response, Nurse Moss stated that Dr. Howard had said they would give Rodriguez-

Ramirez Ibuprofen and monitor the cyst but they were not going to do anything with it now.

*Defts' Ex.* 2 at page 18.  She stated it was not a life threatening issue.  *Id.*

On March 22nd and 23rd defendants indicate requests were faxed on Rodriguez-Ramirez

behalf for him to speak to his public defender.  *Defts' Ex.* 3 at pages 18 & 19.  Rodriguez-

Ramirez merely asserts he repeatedly asks for a translator and/or to speak to someone in his

native language.  *Resp.* at ¶ 55 & ¶ 56.

On April 5th, Rodriguez-Ramirez submitted a request asking to talk to a corporal.  *Defts'*

*Ex.* 3 at page 20.  He stated he wanted to know if someone else was using his name.  *Id.*  He

indicated there were some charges that were not his.  *Id.*

In response, Rodriguez-Ramirez was told no one was using his name at that facility.

*Defts' Ex.* 3 at page 20.  If he was talking about Springdale.  *Id.*  He was told he would have to

contact them.  *Id.*  If he was talking about his failure to appear, he was told that when they served

his warrant they looked up his date of birth and social security number and the charges were his.

*Id.*

On April 6th, Rodriguez-Ramirez stated the April 5th request had been based on a mis-

understanding.  *Defts' Ex.* 3 at page 21.  He asked if he could speak to a sergeant but he or she

would need a translator because he did not speak very good English.  *Id.*  In response, he was

told before he could speak to a sergeant they would need to know why.  *Id.*

-12-

On April 28th, Rodriguez-Ramirez requested legal envelopes. *Resp.* at ¶ 60.  The envelopes were given to him. *Id.*

On May 10th, Rodriguez-Ramirez asked to talk to the nurse about a medical shave. *Resp.* at ¶ 61. In response, he was put on the shave list. *Id.*

Rodriguez-Ramirez was taken to the Nurse's station to be seen by Nurse Johnson on June 8, 2006, about the cyst on his back. *Defts' Ex.* 2 at page 20.  Nurse Johnson had Sgt. Wilson translate for her and she told Rodriguez-Ramirez that he would have to have the cyst taken care of when he got out of jail. *Id.*

Rodriguez-Ramirez contends he was again denied emergency medical treatment. *Resp.* at ¶ 63.  As a result, he indicates he was forced to suffer unreasonably. *Id.*

On June 27th, Rodriguez-Ramirez was served with an arrest warrant for no liability insurance, no driver's license, and improper use of evidence of registration. *Defts' Ex.* 1 at page 14.  Rodriguez-Ramirez indicates he repeatedly asked for a translator based on the fact that he did not speak or understand the English language. *Resp.* at ¶ 64.

Rodriguez-Ramirez was seen by Dr. Howard on July 25th. *Defts' Ex.* 2 at page 20.  Dr. Howard's notes indicates he observed multiple pimples on Rodriguez-Ramirez's back and arm. *Id.*  Dr. Howard prescribed doxycycline. *Id.*

Rodriguez-Ramirez asserts his body was ravaged with staph infection. *Resp.* at ¶ 65(A). He indicates he was in severe pain. *Id.*  Once again, Rodriguez-Ramirez indicates he was denied proper medical treatment.  He states he was not treated for staph infection or pain. *Id.* Rodriguez-Ramirez did receive the doxycycline. *Id.* at ¶ 65(B).

-13-

Since he left the WCDC, Rodriguez-Ramirez has not received any additional medical care for the cyst.  *Resp.* at ¶ 67.  He states he has been repeatedly denied access to proper medical treatment.  *Id.*  Upon arrival at the ADC, Rodriguez-Ramirez indicates he was diagnosed with, and medicated for, a form of tuberculosis (TB).  *Id.*

With respect to the cyst, Rodriguez-Ramirez indicates it has "not disappeared and I'm just dealing with it the best I can.  I will continue to deal with it because it is my personal choice to receive and deny treatment as my discretion."  *Resp.* at ¶ 67.

Rodriguez-Ramirez was asked to describe in detail how he believed Dr. Howard exhibited deliberate indifference to his serious medical needs.  Rodriguez-Ramirez responded as follows:

> I repeatedly requested medical treatment and was repeatedly denied.  I was in extreme pain and seen Dr. Howard several times.  After the first couple of times Dr. Howard seen me and subsequently denied me proper medical treatment he exhibited clear signs of deliberate indifference.  I repeatedly requested medical treatment for a possible cancerous growth coming out of my spine.  I was in extreme pain on several occasions when I had the privilege of receiving "treatment" by Dr. Howard and at every opportunity I was denied proper pain medication.  I was denied a proper diagnosis.  I was refused access to a freeworld hospital for fear that rumors of a staph outbreak at the County Jail would be reported to the public.  This was an ongoing issue.  This medical neglect was with deliberate indifference which caused me to suffer with needless injury that is still apparent on my back.

*Resp.* at ¶ 68.

Rodriguez-Ramirez was asked to explain in detail how Sheriff Helder violated his federal constitutional rights.  In doing so, Rodriguez-Ramirez was directed to state whether he ever personally spoke to, or communicated with, Sheriff Helder.  Rodriguez-Ramirez responded as follows:

-14-

> Sheriff Helder has direct authority over the Washington County Jail. When I was incarcerate @ the jail under Sheriff Helder's custody I was subjected to extreme physical pain caused by deliberate neglect and indifference to my medical needs at the hands of medical staff directly under the supervision and authority of Sheriff Helder. I have a constitutional right to humane medical treatment. I have been subject to a consistent pattern of willful medical neglect and indifference. It is cruel and unusual punishment per the 8th amendment of the constitution of the United States of America. Furthermore it violates the 14th Amendment right of due process and equal protection. Sheriff Helder's failure to act on my medical complaints in a timely and humane manner violates his oversight duties as sheriff over the county jail. In violating his oath of office he acted in an individual capacity not authorized in his official capacity. Thereby revoking his color of law immunity as sheriff.

*Resp.* at ¶ 69.

Rodriguez-Ramirez was asked to explain how he believed Sheriff Helder could have dropped the INS charges or caused the INS to transport him to Mexico to see his Father. Rodriguez-Ramirez responded that Sheriff Helder did not properly oversee the jail. *Resp.* at ¶ 36(C). Rodriguez-Ramirez maintains Corporal Matthews, who was under Sheriff Helder's supervision, destroyed his legal documents. *Id.* Rodriguez-Ramirez also maintains he was constantly manipulated and discarded by officers at every level of the chain of command. *Id.* Rodriguez-Ramirez indicates his attempts to diplomatically resolve the issue were ignored. *Id.* Rodriguez-Ramirez states his answer is this: "Tim Helder could not help me because he does not take an active interest in the Washington County Jail. My requests were ignored by floor deputies so they may not have been received by Sheriff Helder."

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### Discussion

Defendants have now moved for summary judgment.  First, they contend there is no evidence of discrimination against Rodriguez-Ramirez.  Assuming for purposes of this motion there is some evidence of discrimination against Rodriguez-Ramirez, they contend there is no basis on which Sheriff Helder can be held liable.  Second, they contend there is no evidence Rodriguez-Ramirez was denied any necessary medical treatment.  Finally, they contend Sheriff Helder was not involved in any decisions regarding Rodriguez-Ramirez's medical treatment and there is no basis on which he can be held liable.

### Discrimination/Language Barrier

It is not clear whether the speaking of a language other than English as a primary language, by itself, serves as an indicator of race or national origin for purpose of the Equal

-16-

Protection Clause.  *See e.g., Hernandez v. New York*, 500 U.S. 352, 371, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)("It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis."); *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983)("language, by itself, does not identify members of a suspect class").  However, in this case, Rodriguez-Ramirez alleges both that he was Spanish speaking and he was Hispanic.

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race."  *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)(citation omitted).  Only *deliberate* discrimination is actionable under the Equal Protection Clause.  *Personnel Administrator v. Feeney*, 442 U.S. 256, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979); *Washington v. Davis*, 426 U.S. 229, 239- 48, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976).  Thus, a claim of racial discrimination under the Equal Protection Clause requires a showing of discriminatory intent.  *Washington*, 426 U.S. at 239-40.

Here, there is no genuine issue of fact as to whether Sheriff Helder intentionally discriminated against Rodriguez-Ramirez because he is Hispanic and/or because Spanish is his primary language.  Although, Rodriguez-Ramirez has alleged this discrimination took a number of forms such as his not being afforded a translator, not having access to immigration officials, not being able to communicate with his public defender, not being able to communicate with his family, and not being able to obtain necessary medical care, these conclusory allegations are not supported in any way.  *See e.g., Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001)("Like any other civil litigant [a pro se litigant is] required to respond to defendants' motion with specific factual support for his claims to avoid summary judgment").

-17-

Rodriguez-Ramirez does not challenge the application of a particular policy of Washington County.  He clearly knew how to submit grievances, general requests, and medical requests and was aware of the sick call process.  *See Defts. Ex.* 3.  While he may have had to rely on "jail house translators," he was able to submit requests, received responses to his requests, and on at least two occasions he submitted his requests in Spanish to a bilingual deputy and received responses in Spanish.  Additionally, the record indicates that on at least one visit to the nurse another bilingual officer acted as a translator.

Nor does Rodriguez contend he needed a translator at a particularly important time such as during disciplinary proceedings against him.  *Cf., Gonzales-Perez v. Harper*, 241 F.3d 633, 637 (8th Cir. 2001)(finding failure to provide an interpreter at all disciplinary hearings did not result in a due process or equal protection violations when the inmate was proficient enough in English to understand the nature of the hearings and was able to respond to them and a Spanish interpreter was reasonably available when he so requested).  Instead, he appears to contend he should have been provided a certified translator throughout his incarceration at the WCDC.  The court knows of no such statutory or constitutional requirement.

Moreover, he makes no argument that Sheriff Helder was personally involved in any of these events.  Instead, he maintains Sheriff Helder should be held liable merely because he is in charge of the jail.  This is an insufficient basis for liability under § 1983.  *See e.g., Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007)("Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights. . . .  A Warden's general

-18-

responsibility for supervising the operations of a prison is insufficient to establish personal involvement.")(internal quotation marks and citations omitted).

In connection with his problems with communication, Rodriguez-Ramirez has made no argument that he was unable to use the mail and/or phone. He does not argue that his public defender was not free to call him, write him, or visit him at the jail. Similarly, he does not argue he could not write his family or that his family could not write to him or visit him at the jail. With respect to the immigration officials, when he was asked to explain why he did not contact the INS officials or have a family member contact them, Rodriguez-Ramirez responded he had trouble getting a request form from officers much less getting anything productive accomplished. *Resp.* at ¶ 39(B). However, the summary judgment record contains twenty four request forms and/or legal assistance forms submitted by Rodriguez-Ramirez, or on his behalf, from January 26 to June 8, 2006. *Defts' Ex.* 3. As noted above, two of these forms were completed in Spanish and replied to in Spanish.

In connection with his requests for medical care, each of Rodriguez-Ramirez's requests were responded to. He was treated by both the doctor and nurse. While Rodriguez-Ramirez does not believe he received appropriate care, nothing suggests this was related in any way to his being Hispanic.

### *Medical Care*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). "Deliberate indifference to an inmate's serious

medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir. 2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by

-20-

medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).   In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976).  Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239.  *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

In this case, Rodriguez-Ramirez contends Dr. Howard did not:  (1) properly diagnosed and treat the bumps on his back and head; and (2) properly treat the cyst on his back.  While Rodriguez-Ramirez does not believe the treatment he received was adequate or that the conditions were diagnosed correctly, a difference of opinion between Rodriguez-Ramirez and Dr. Howard regarding his treatment or diagnosis does not give rise to a § 1983 claim. *Alberson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006)(disagreement with treatment decisions does not rise to level of constitutional violation; to establish deliberate indifference, plaintiff must show more than even gross negligence).  Even if Dr. Howard incorrectly diagnosed Rodriguez-Ramirez's conditions, an assumption that is not supported by the summary judgment record, this would at

-21-

most constitute negligence or medical malpractice which is insufficient to rise to the level of a constitutional violation. *See e.g., Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)(mere negligence or medical malpractice is insufficient to rise to the level of a constitutional violation).

Moreover, Rodriguez-Ramirez has presented no evidence that the delay in his treatment for the cyst had any detrimental impact on his health. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)(inmate who complains about delay in medical treatment must present verifying medical evidence of detrimental effect of delay). In fact, since his transfer to the ADC Rodriguez-Ramirez has received no additional treatment for the cyst. *Resp.* at ¶ 67. We find there are no genuine issues of material fact as to whether Dr. Howard was deliberately indifferent to Rodriguez-Ramirez's serious medical needs.

Finally, with respect to Sheriff Helder there is no evidence he was personally involved in making any decisions regarding Rodriguez-Ramirez's medical care or treatment. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence that the defendants were doctors or were personally involved in making medical decisions about treatment); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility).

## Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 15) be granted and this case be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely**

-22-

**objections may result in waiver of the right to appeal questions of fact.  The parties are**

**reminded that objections must be both timely and specific to trigger de novo review by the**

**district court.**

DATED this 27th day of August 2007.


/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)